DAVID S. MENDEL
Email: MendelD@sec.gov
ROBERT I. DODGE
Email: DodgeR@sec.gov
MATTHEW C. SOLOMON
Email: SolomonM@sec.gov
PAUL E. KIM
Email: KimPa@sec.gov

SECURITIES AND EXCHANGE
COMMISSION
100 F Street, N.E.
Washington, D.C. 20549-5971
Telephone: (202) 551-4418
Facsimile: (202) 551-9282

LOCAL COUNSEL:
John B. Bulgozdy, Cal. Bar No. 219897
Email: BulgozdyJ@sec.gov

SECURITIES AND EXCHANGE
COMMISSION
444 South Flower Street, Suite 900
Los Angeles, CA 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

Attorneys for Plaintiff
Securities and Exchange Commission

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>ASHISH AGGARWAL, SHAHRIYAR BOLANDIAN, and KEVAN SADIGH,<br><br>Defendants,<br><br>and<br><br>FARHAD BOLANDIAN and PARDIS BOLANDIAN,<br><br>Relief Defendants. | Case No. 2:15-cv-06460-TJH-AJW<br><br>**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |

Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this action pursuant to Sections 21A and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u-1 and 78aa].

2.      Venue in this district is proper pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Among other things, certain of the acts, practices, and courses of business constituting the violations of the federal securities laws alleged herein occurred within the Central District of California.

## SUMMARY OF THE ACTION

3.      This insider trading case involves coordinated, illegal trading in stock and stock options of two separate companies that participated in merger activity in which the same investment bank, J.P. Morgan Securities LLC ("JPMS"), played an advisory role.  As alleged below, Ashish Aggarwal ("Aggarwal"), a former JPMS analyst, learned and misappropriated material, nonpublic information about the impending transactions from his employer, JPMS.  Aggarwal tipped his close friend Shahriyar Bolandian ("Bolandian") about the impending transactions in breach of a duty to keep the information confidential.  Bolandian, in turn, tipped his work colleague and friend, Kevan Sadigh ("Sadigh").  Bolandian and Sadigh, acting largely in parallel, reaped large profits by using the misappropriated information to make unlawful securities trades.

4.      As an investment banking analyst in JPMS's San Francisco office, Aggarwal was privy to confidential information about two separate corporate acquisitions involving JPMS clients.  In 2012, Aggarwal learned of an impending acquisition of PLX Technology, Inc. ("PLXT") by a JPMS client.  In 2013, Aggarwal learned of an impending acquisition of JPMS client ExactTarget, Inc.

("ExactTarget") by another company.  In both instances, Aggarwal learned material, nonpublic information that he knew or was reckless in not knowing likely would cause the stock prices of both PLXT and ExactTarget to quickly and significantly increase upon near-term public announcements.

5.     During the weeks before the public announcements of the transactions, and while in possession of the material, nonpublic information about them, Aggarwal repeatedly exchanged telephone calls and text messages with Bolandian, and Bolandian and Sadigh repeatedly texted each other or called each other's cell phones.  In several instances, the communications between Bolandian and Sadigh took place within minutes of Aggarwal's communications with Bolandian.

6.      During these same time periods, before the public announcements of the transactions, Bolandian and Sadigh made a series of trades in PLXT and ExactTarget securities.  These trades included:  (a) trades by Bolandian in PLXT and ExactTarget securities within an hour of his phone calls or text messages with Aggarwal; (b) trades by Bolandian in ExactTarget securities through an off-shore brokerage account that Bolandian opened and funded just one week before the public announcement of the ExactTarget acquisition; (c) trades by Bolandian and Sadigh in the same series of call options of PLXT and ExactTarget – trades that frequently constituted all of the day's trading volume in those series – often within minutes or hours of each other; and (d) trades by Bolandian in the brokerage accounts of family members.

7.     After the public announcement of the PLXT acquisition on April 30, 2012, and the public announcement of the ExactTarget acquisition on June 4, 2013, respectively, the prices of PLXT and ExactTarget substantially increased, leading to total illicit profits of approximately $453,000 for Bolandian and his family members, and approximately $219,000 for Sadigh.

8.     Additionally, in the weeks before the public announcement of the ExactTarget acquisition, while in possession of material, nonpublic information

about that impending acquisition, Aggarwal recommended to a different friend ("Friend One") that he purchase ExactTarget call options.  Friend One purchased the options that Aggarwal recommended.  After the June 4, 2013, public announcement of the ExactTarget acquisition, Friend One sold the options for a profit of approximately $6,600.  Friend One later shared the profit from these transactions with Aggarwal, giving him a check for $6,000, which Aggarwal accepted.

9.     By knowingly or recklessly engaging in the conduct described in this complaint, Aggarwal, Bolandian, and Sadigh (collectively, "Defendants") violated and, unless enjoined, will continue to violate Section 10(b) and 14(e) of the Exchange Act [15 U.S.C. §§ 78j(b), 78n(e)] and Rules 10b-5 and 14e-3 thereunder [17 C.F.R. §§ 240.10b-5, 240.14e-3].

## DEFENDANTS AND RELIEF DEFENDANTS

10.     **Ashish Aggarwal**, age 28, currently resides in or around San Francisco, California.  Aggarwal graduated from the University of California-Berkeley ("Berkeley") in 2010 with a bachelor's degree, and, from June 2011 to June 2013, was an investment banking analyst in the San Francisco office of JPMS.  Aggarwal invoked his Fifth Amendment privilege against self-incrimination and refused to provide documents in response to a Commission investigative subpoena.

11.     **Shahriyar Bolandian**, age 27, currently resides in or around Los Angeles, California.  Bolandian graduated from Berkeley in 2010 with a bachelor's degree.  During the time periods in 2012 and 2013 relevant to this Complaint's allegations, Bolandian was employed by Greek Life Threads, an e-commerce company specializing in college fraternity and sorority clothing that was founded by Sadigh.  Bolandian invoked his Fifth Amendment privilege against self-incrimination and refused to provide documents in response to a Commission investigative subpoena.

12.     **Kevan Sadigh,** age 29, currently resides in or around Los Angeles, California.  In 2009, Sadigh graduated from the University of California-Irvine and

founded Greek Life Threads.  Sadigh invoked his Fifth Amendment privilege against self-incrimination and refused to provide documents in response to a Commission investigative subpoena.

13. **Farhad Bolandian** ("Farhad"), age 65, currently resides in or around Los Angeles, California and is the father of Shahriyar Bolandian and Pardis Bolandian.

14. **Pardis Bolandian** ("Pardis"), age 37, currently resides in or around Los Angeles, California and is the older sister of Bolandian.

## **RELEVANT PERSONS AND ENTITIES**

15. **J.P. Morgan Securities LLC** is a Delaware limited liability corporation with its principal place of business in New York, New York.  JPMS is registered with the Commission as a broker-dealer and as an investment adviser. JPMS is a wholly-owned subsidiary of JPMorgan Chase & Co. ("JPMorgan Chase"), a publicly-traded financial holding company, incorporated in Delaware, with its principal place of business in New York, New York.  JPMS was the financial adviser to Integrated Device Technology, Inc. ("IDTI") in its planned acquisition of PLXT (the "IDTI-PLXT Transaction"), and to ExactTarget in its acquisition by salesforce.com, inc. ("CRM") (the "CRM-ExactTarget Transaction").

16. **ExactTarget, Inc.** was a Delaware corporation headquartered in Indianapolis, Indiana, and a provider of email and cloud marketing services. ExactTarget's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the New York Stock Exchange (the "NYSE") using the ticker symbol ET.  After ExactTarget announced on June 4, 2013, that it would be acquired by CRM for $2.5 billion, ExactTarget's stock price increased by 52.4%.  On July 12, 2013, ExactTarget formally merged into and became a wholly-owned subsidiary of CRM, at which time ExactTarget's shares were withdrawn from listing on the NYSE.

17.   **salesforce.com, inc. ("CRM")** is a Delaware corporation headquartered in San Francisco, California, and a provider of enterprise cloud computing services. CRM's common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act and trades on the NYSE using the ticker symbol CRM.

18.   **PLX Technology, Inc.** was a Delaware corporation headquartered in Sunnyvale, California, and a provider of integrated circuits that perform system connectivity functions.  PLXT's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the NASDAQ using the ticker symbol PLXT.  On April 30, 2012, PLXT announced that it would be acquired by IDTI for $330 million.  After the announcement, PLXT's stock increased by 67%.  PLXT did not complete its merger with IDTI and merged with a different company in 2014.

19.   **Integrated Device Technology, Inc.** is a Delaware corporation headquartered in San Jose, California, and a provider of integrated circuits.  IDTI's common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act and trades on the NASDAQ using the ticker symbol IDTI.

20.   **Analyst One**, age 28, was an investment banking analyst at JPMS's San Francisco office from June 2010 to June 2012.  Analyst One was a member of the IDTI deal team and one of the first individuals at JPMS to become aware of the possible acquisition of PLXT by IDTI.  Analyst One was friends with Aggarwal.

21.   **Analyst Two**, age 27, was an investment banking analyst at JPMS's San Francisco office from June 2011 to June 2013.  Analyst Two was a member of the ExactTarget deal team and one of the first individuals at JPMS to become aware of ExactTarget's acquisition.  Analyst Two was friends with Aggarwal.

22.   **Analyst Three**, age 26, was an investment banking analyst at JPMS's San Francisco office from June 2012 to July 2014.  Analyst Three was a member of the ExactTarget deal team and one of the first individuals at JPMS to become aware of ExactTarget's acquisition.  Analyst Three was friends with Aggarwal.

23. **Friend One**, age 27, received undergraduate degrees from Berkeley in 2010. While at Berkeley, he met and became friends with Aggarwal. The two remained friends at least through early 2014.

## COMMONLY-USED TRADING TERMS

24. A "call option" is a type of security. A standardized equity call option gives its purchaser-holder the option to buy 100 shares of an underlying stock at a specified price (the "strike" price) by an expiration date. As a practical matter, at all times relevant to this Complaint, the expiration date of such an option was the third Friday of the month in which the option was scheduled to expire. For example, a purchaser of 400 September 2012 call options in ABC stock, with a "strike price" of $5.00, had the right to buy 40,000 shares of ABC stock at $5.00 per share from the purchase date of the options until the third Friday in September 2012. Generally, a purchaser of an equity call option hopes the underlying stock will increase in price, so that the purchaser can sell the option in the open market for a profit or have the right to buy the stock at a "strike price" that is lower than the market price.

25. An "option premium" is the price that a purchaser pays for a call option. All other things being equal, option premiums generally are higher for call options with longer expiration periods and lower for call options with shorter expiration periods. Thus, by purchasing a call option with a shorter expiration period instead of an option with a longer expiration period, a purchaser can potentially achieve greater trading profits in the event the underlying stock price surges before the shorter expiration date.

26. A call option is "out of the money" when the option's strike price is above the current market price for the underlying stock. An "out of the money" call option is unprofitable to exercise unless the market price of the underlying stock increases above the call option's "strike price" before the call option's expiration date.

27.     A call option "series" is a group of options on the same underlying stock that have the same strike price and expire in the same month.

## FACTS

**A.      Aggarwal's Employment at JPMS and Duty to Maintain Confidentiality of JPMS Information**

28.     At all times relevant to this Complaint, analysts in the investment banking department of JPMS in San Francisco, including Aggarwal, regularly were exposed to material, nonpublic information by virtue of their work, which often involved financial and market analysis on behalf of JPMS clients in connection with confidential merger discussions.

29.     Within the investment banking department of JPMS, Aggarwal was a member of the Technology, Media & Telecommunications ("TMT") Group.  As reflected in electronic communications between Aggarwal and his fellow analysts, described below in this Complaint, analysts within the TMT Group, including Aggarwal, generally were familiar with the status of – and had access to material, nonpublic information concerning – not only matters to which they were personally assigned, but also deals that other TMT group analysts were handling on behalf of JPMS clients.  In addition, the physical layout of the investment banking department in JPMS's San Francisco office and Aggarwal's close proximity to other analysts in the department provided Aggarwal opportunities to obtain material, nonpublic information about various deals and transactions, even when Aggarwal was not assigned to work on them.

30.     Aggarwal had a duty to preserve the confidentiality of the information that he learned or received from JPMS in the course of his employment, including information obtained from his fellow analysts, and to avoid divulging material, nonpublic information to outsiders.  For example, during his employment at JPMS, Aggarwal was subject to JPMS's "Code of Conduct."  The Code of Conduct directed Aggarwal to assume that information about JPMS clients was confidential "unless

the contrary is clear," and prohibited Aggarwal from disclosing "confidential information to anyone outside the firm" unless he was "authorized to do so."

31.    JPMS's Code of Conduct also expressly prohibited insider trading.  The Code of Conduct provided:  "If you are aware of inside information … you may not pass along any inside information expressly or by way of making a recommendation for the purchase or sale of such securities based upon inside information"; that "inside information" was "material, nonpublic information about the securities, activities, or financial condition of a corporation, public entity, or other issuer of securities or financial instruments"; and that the JPMS prohibitions on passing along inside information "are applicable no matter how you acquired the inside information."

32.    The Code of Conduct also subjected Aggarwal to personal trading restrictions.  Under these rules, Aggarwal was required to pre-clear all personal securities trades that he made while employed as a JPMS analyst, with limited exceptions, and to report all such trades to his employer.

33.    On August 25, 2010 and again on July 4, 2012, Aggarwal affirmed that he "read, understood, and [was] in compliance with the ... Code of Conduct." Aggarwal also agreed, "as a condition of [his] employment, to remain in compliance with the Code."  Aggarwal thus knew that he had a duty to preserve the confidentiality of information that he learned or received from his employer, and that he was prohibited from disclosing material, nonpublic information to outsiders except as authorized by JPMS.

**B.    Defendants' Relationships With One Another**

34.    Aggarwal and Bolandian became close friends after meeting as Berkeley students.  In 2012 and 2013, Aggarwal and Bolandian frequently communicated with each other by telephone and text message.  Although they lived and worked in different parts of California, they regularly visited each other on weekends and took vacations together.

35.     Bolandian knew that Aggarwal worked in the investment banking department of JPMS.  Among other things, Aggarwal sent emails to Bolandian from his corporate email account at JPMS.  The emails reflected the fact that Aggarwal worked at JPMS in "Technology, Media & Telecom/Investment Banking."

36.     Bolandian also was close friends with Sadigh, whom Bolandian has known since childhood.  In 2012 and 2013, Bolandian worked for Sadigh's company, Greek Life Threads, in the greater Los Angeles area.  As both co-workers and friends, Bolandian and Sadigh regularly communicated with each other in 2012 and 2013 through a variety of means.

37.     As mutual friends of Bolandian, Sadigh and Aggarwal knew and were friendly with one another.  Sadigh understood that Bolandian and Aggarwal were friends from college, that Aggarwal worked in investment banking in San Francisco, California, and that Aggarwal was affiliated with JPMorgan Chase.

## C.  **Bolandian and Sadigh's Securities Trading Experience**

38.     Bolandian and Sadigh were experienced traders who traded securities on a regular basis.  In a 2012 brokerage account application, Bolandian indicated that he had seven years of options trading experience and 13 years of experience trading stocks.  In a 2013 brokerage account application, Sadigh indicated that he had "6-10" years of options and stock trading experience and that his investment knowledge was "extensive."

39.     During times relevant to this Complaint, Bolandian actively traded various securities through brokerage accounts that he maintained at TD Ameritrade, Inc. ("TDA") and Interactive Brokers LLC ("Interactive Brokers"), and Sadigh actively traded various securities through brokerage accounts that he maintained at OptionsHouse, LLC ("OptionsHouse") and Interactive Brokers.  From February 2012 to June 2013, Bolandian and Sadigh each made hundreds of securities-related orders through their respective accounts.

40.    Records from the above-mentioned brokerage accounts show that in 2012, Bolandian and Sadigh did not trade in PLXT until they both did so in April of that year, two weeks before the public announcement that PLXT was being acquired by IDTI.  These records also show that, in 2012 and 2013, Bolandian and Sadigh did not trade in ExactTarget until they both did so in May 2013, less than a month before the public announcement that ExactTarget was being acquired by CRM.

### D.    Aggarwal and Bolandian's Joint Securities Trading

41.    From at least 2012 and continuing into 2013, Bolandian, in consultation with Aggarwal, conducted securities trades through one or more of his brokerage accounts on behalf of himself and Aggarwal.  This arrangement enabled Aggarwal to circumvent JPMS's pre-clearance rules and potentially to share in any profits from Bolandian's securities trades that Aggarwal otherwise may not have been able to conduct on his own behalf.

42.    For example, in August 2012, Aggarwal and Bolandian exchanged emails in which they discussed their jointly-held positions in several different issuers, and Bolandian executed trades in the securities of these issuers in his TDA account.  JPMS records show that Aggarwal did not seek pre-clearance for or report trades in any of these securities, or for any trades at all in August 2012.

43.    Similarly, in an email on December 4, 2012, Aggarwal wrote to Bolandian that he was "[d]own for TRLA if its down but not max position," to which Bolandian replied, in part, "[y]es will keep an eye on trla ... . Trla equity if it's down."  Aggarwal then wrote back, "[y]es to what you said on TRLA … ."  Several hours later Bolandian replied, in part, "[g]ot into trla."  That same day in his TDA account, Bolandian purchased stock in Trulia, Inc. (ticker: "TRLA").  At no time while a JPMS employee did Aggarwal seek pre-clearance for or report trades in TRLA securities.

44.    By March 2013, if not earlier, Bolandian and Aggarwal's trading arrangement had resulted in joint losses, and these losses had depleted their

11

designated trading funds.  In instant messages that the two exchanged in March 2013, Bolandian expressed reluctance to participate in a securities trade being proposed by Aggarwal as it would require the use of reserve funds that were "not the original [trading] money anymore."  In response, Aggarwal referenced his own trading losses of $100,000 from the arrangement ("im down to add it to my tab (yes the 100k one) if youre not down and ok with that") and the fact that he and Bolandian were "both in the same boat."

> ### E.     Insider Trading In PLXT

> #### *IDTI Retains JPMS to Advise Its Intended Purchase of PLXT*

45.    In January 2012, IDTI contacted JPMS to discuss a potential engagement as financial adviser to assist with IDTI's intended acquisition of PLXT. IDTI verbally engaged JPMS as its exclusive financial adviser in February 2012 and formally engaged JPMS in March 2012.  Internally, JPMS referred to its confidential engagement with IDTI as "Ironwood."

46.    By April 12, 2012, negotiations concerning IDTI's potential acquisition of PLXT had significantly advanced.  IDTI's Board of Directors had authorized an expression of interest to acquire PLXT for $6.75 to $7.00 per share, well above the price of $3.68 to $4.00 per share at which the common stock traded during the days before the board acted.  In addition, IDTI, JPMS, and IDTI's outside counsel had engaged in discussions with PLXT and its advisers regarding transaction structure and timeline.  Also, JPMS had attended due diligence meetings between IDTI and PLXT and was provided access to due diligence information from PLXT. Confidential and nonpublic negotiations between IDTI and PLXT continued until the public announcement of the IDTI-PLXT Transaction on April 30, 2012.

> #### *Aggarwal Learns of the IDTI-PLXT Transaction*

47.    Before the April 30, 2012 public announcement of the IDTI-PLXT Transaction, Aggarwal obtained material, nonpublic information about the impending transaction from sources within JPMS.

48.     Advance knowledge of an acquisition announcement is valuable because the announcement typically triggers an increase in the price of an acquisition target's securities due to the premium that the acquirer is willing to pay. A reasonable investor would have viewed the information regarding the impending IDTI-PLXT Transaction as being important to his investment decision or as significantly altering the total mix of information available to the public.  In addition, the information was considered confidential by JPMS and IDTI.

49.     Aggarwal had access to confidential, nonpublic information about the impending IDTI-PLXT Transaction through, among other sources, a friend and co-worker, Analyst One.  Analyst One was a member of the IDTI deal team and was among the first individuals at JPMS to learn, in January 2012, of IDTI's possible acquisition of PLXT.  Analyst One had graduated from Berkeley with Aggarwal in 2010, and the two analysts subsequently worked together in the TMT Group and socialized with one another outside JPMS on a regular basis.  JPMS records indicate that, from January 2012 until the announcement of the IDTI-PLXT Transaction on April 30, 2012, Analyst One sat on the same side of the same floor at JPMS as Aggarwal.

50.     On Sunday, April 15, 2012, Analyst One forwarded Aggarwal an email about JPMS's work on behalf of IDTI.  In the email, which had the subject line "Re: Ironwood transaction messaging," a JPMS associate on the IDTI deal team had asked Analyst One about the preparation of "press releases for IDT[I]."  By forwarding the email, which Aggarwal received and responded to four minutes later, Analyst One informed or confirmed for Aggarwal that JPMS was a financial advisor to IDTI for an upcoming transaction, and that negotiations regarding the transaction were in advanced stages.  By virtue of Aggarwal's membership in the TMT Group and friendship with Analyst One, and as reflected by his pattern of communications with Bolandian and Bolandian's subsequent trades in PLXT securities, Aggarwal

1  knew when he received Analyst One's April 15 email that the other company

2  involved in the "Ironwood transaction" was PLXT.

3     51.    Between Thursday, April 12, 2012, and Saturday, April 14, 2012,

4  records show that Aggarwal and Bolandian exchanged over 70 text messages and

5  had at least four telephone calls.  During this same time period, records show that

6  Bolandian and Sadigh exchanged over 250 text messages.  On Sunday, April 15,

7  2012, several hours after Aggarwal received the forwarded "Ironwood" email from

8  Analyst One, starting at 11:34 p.m., records show that Aggarwal and Bolandian

9  spoke for over 30 minutes on their cell phones.

10  ***April 16, 2012***

11     52.    On Monday, April 16, 2012, the outside law firm representing IDTI in

12  the impending IDTI-PLXT Transaction distributed an initial draft of a merger

13  agreement to PLXT and its advisers.  From April 16, 2012 through April 22, 2012,

14  IDTI, its outside law firm, and JPMS continued due diligence review of PLXT.

15     53.    Also on April 16, 2012, from 10:28 a.m. to 10:39 a.m., records show

16  that Aggarwal and Bolandian exchanged at least five text messages.

17     54.    Beginning several minutes later, Bolandian made his first purchases of

18  PLXT securities.  Specifically, at 10:47 a.m. and 10:52 a.m., Bolandian bought 200

19  shares of PLXT stock and 30 call options in PLXT that had a strike price of $5.00

20  and were set to expire in September 2012 ("September $5.00 PLXT call options"),

21  using funds wired to his TDA brokerage account on April 13, 2012.  Less than half

22  an hour after Bolandian's purchases, from 11:15 a.m. to 11:16 a.m., Bolandian and

23  Aggarwal exchanged additional text messages.

24     55.    Also on April 16, 2012, at 9:23 a.m., Sadigh bought 500 shares of

25  PLXT stock and 30 September $5.00 PLXT call options in his OptionsHouse

26  account, using funds he received by wire transfer on April 13, 2012.

27     56.    Bolandian's and Sadigh's combined purchases of 60 September $5.00

28  PLXT call options on April 16, 2012 represented 100% of the total trading in that

1   call option series that day, across all exchanges.  On that day, PLXT stock closed at

2   $3.84 per share, rendering Bolandian's and Sadigh's purchases significantly "out of

3   the money."

4   ***April 17, 2012***

5   57.    On Tuesday, April 17, 2012, at 10:06 a.m., Sadigh bought 1,000 shares

6   of PLXT stock in his OptionsHouse account using funds he received from a wire

7   transfer the previous day.

8   58.    A short time later, on April 17, 2012, at 10:27 a.m., records show that

9   Aggarwal sent a text message to Bolandian.  At 10:56 a.m., Bolandian bought 25

10  September $5.00 PLXT call options.  Six minutes later, at 11:02 a.m., Sadigh bought

11  50 September $5.00 PLXT call options.  Beginning at 11:26 a.m. and continuing

12  over the course of the next several hours, records show that Aggarwal and Bolandian

13  exchanged 23 text messages.  During this same time period, at 11:55 a.m., Bolandian

14  called and spoke to Sadigh for almost four minutes.

15  59.    Bolandian's and Sadigh's combined purchases of 75 September $5.00

16  PLXT call options on April 17 constituted 100% of the total trading in that call

17  option series that day, across all exchanges.  Once again, these call options were

18  significantly "out of the money" – the closing stock price of PLXT that day was

19  $3.92 per share.

20  ***April 18, 2012***

21  60.    The next day, on Wednesday, April 18, 2012, records show that

22  Bolandian texted Sadigh at 12:46 a.m.  Later that same morning, at 9:32 a.m., Sadigh

23  bought 1,000 shares of PLXT stock.  Records show that shortly before noon on April

24  18, Bolandian called and spoke with Sadigh for 12 minutes.  Additionally, between

25  12:33 p.m. and 2:49 p.m., Bolandian exchanged approximately 20 text messages

26  each with Sadigh and Aggarwal.

27

28

*April 19, 2012*

61.     On Thursday, April 19, 2012, records show that Aggarwal and Bolandian exchanged over 40 text messages between 1:03 a.m. and 1:33 a.m. Bolandian and Sadigh then exchanged 17 text messages between 6:20 a.m. and 6:37 a.m.

62.     Shortly after exchanging text messages with each other, both Bolandian and Sadigh made additional purchases of PLXT stock and out-of-the-money call options.  Between 6:45 a.m. and 7:27 a.m., Bolandian purchased 145 September $5.00 PLXT call options and 1,000 shares of PLXT stock.  Between 7:05 a.m. and 7:11 a.m., Sadigh bought 20 September $5.00 PLXT call options and 1,000 shares of PLXT stock.

63.     Bolandian's and Sadigh's combined purchases of 165 September $5.00 PLXT call options on April 19 represented 100% of the total trading in that call option series on that day, across all exchanges.  The closing price of PLXT stock that day was $3.84 per share.

*April 20-21, 2012*

64.     Beginning on Friday, April 20, 2012, JPMS employees participated in a series of meetings with IDTI, PLXT, and their advisers to discuss material open issues in the draft merger agreement.

65.     That same day, in the afternoon, Bolandian called Aggarwal at his JPMS office extension.  Records show that the two spoke for at least seven minutes.

66.     Also that same day, account records show that $7,000 was deposited into Farhad Bolandian's TDA brokerage account.  On information and belief, these monies were deposited into Farhad's account for the purpose of making the unlawful PLXT trades that occurred in the days that followed.

67.     That evening, Aggarwal and Analyst One worked late at JPMS.  An internal JPMS record shows that Aggarwal ordered dinner for himself, Analyst One,

and three other JPMS associates.  Analyst One billed his dinner to JPMS's expense code for "Ironwood" – the IDTI-PLXT transaction.

68.    The following day, Saturday, April 21, 2012, records indicate that Aggarwal and Bolandian had at least five telephone conversations, with one lasting over eight minutes.

*April 23-30, 2012*

69.    On Monday, April 23, 2012, at 9:06 a.m., 1,000 shares of PLXT stock were purchased in Farhad's TDA account, using funds deposited into the account on April 20, 2012.  This was the first securities trade in Farhad's TDA account in 2012, and the first trade of PLXT securities in the account.

70.    Later that evening, telephone records show that Bolandian and Sadigh spoke for over half an hour.

71.    The next morning, on April 24, 2012, Sadigh bought 100 September $5.00 PLXT call options and 500 shares of PLXT stock.  The closing price of PLXT stock that day was $3.87 per share.  Sadigh's purchase of these out-of-the-money PLXT call options constituted 100% of the total trading in that call option series that day, across all exchanges.

72.    In fact, in April 2012, there were a total of 420 September $5.00 PLXT call options traded across all options exchanges.  Bolandian and Sadigh's collective purchases of 400 September $5.00 PLXT call options between April 16 and April 24, 2012, thus constituted 95% of the total purchases of that option series by all traders, across all exchanges, in the month of April.

73.    Meanwhile, Aggarwal continued to obtain information about the status of the impending IDTI-PLXT Transaction, and he continued to communicate with Bolandian.  On Saturday evening, April 28, 2012, Aggarwal exchanged instant messages with Analyst One in which Analyst One referenced draft investor materials that had been prepared for a "pending deal" involving "IDT[I]."  A little over a day later, on Monday, April 30, 2012, at 12:31 a.m., records show that Bolandian called

Aggarwal on his JPMS office extension, and the two men spoke for at least 25 minutes.

### IDTI and PLXT Publicly Announce the Transaction, and Bolandian and Sadigh Sell PLXT for Substantial Profits.

74.     After U.S. markets closed on April 30, 2012, IDTI and PLXT announced to the public that that they had signed a definitive agreement providing that IDTI would acquire all of the outstanding shares of PLXT pursuant to an exchange offer and subsequent merger.  In the acquisition, PLXT stockholders would receive $3.50 in cash and 0.525 shares of IDTI common stock (closing price on April 30, 2012:  $6.78 per share) for each PLXT common share outstanding.

75.     Before April 30, 2012, the proposed merger between IDTI and PLXT was material, nonpublic information.  PLXT's price and trading volume both increased substantially after the public announcement.  PLXT's stock closed at $6.66 per share on May 1, 2012, an increase of 67% from the closing price of $3.98 per share on April 30, 2012.  PLXT's trading volume increased 638%, from 741,428 shares on April 30, 2012, to 5,471,744 shares on May 1, 2012.

76.     After the public announcement, between May 8 and May 30, 2012, Bolandian and Sadigh sold all of their PLXT shares and call options, and all of the PLXT shares were sold from Farhad's account.  As a result of the foregoing trades in PLXT securities, Bolandian and his father gained approximately $36,200 in illicit profits, and Sadigh gained approximately $41,200 in illicit profits.

### F.     Insider Trading in ExactTarget

### JPMS is Engaged as ExactTarget's Financial Advisor in Connection with a Merger

77.     On April 25, 2013, ExactTarget contacted JPMS to inform JPMS that it anticipated receiving offers from two companies to enter into a merger transaction. ExactTarget invited JPMS to make a presentation regarding the services it could

provide as a prospective financial advisor to ExactTarget's Board of Directors in connection with these anticipated offers.

78.    On May 1, 2013, ExactTarget formally engaged JPMS as its financial advisor.  That same day, JPMS attended a meeting of the Special Committee of ExactTarget's Board of Directors ("Special Committee") to consider an indication of interest by CRM for a potential transaction with ExactTarget and to discuss other potential business combination partners for ExactTarget.  Thereafter, JPMS acted as the exclusive financial adviser to ExactTarget in connection with the CRM-ExactTarget Transaction.  Internally, JPMS referred to its confidential engagement with ExactTarget as "Excalibur" or "Excal."

79.    The negotiations between ExactTarget and CRM were confidential and nonpublic until June 4, 2013, when CRM and ExactTarget publicly announced that CRM would be acquiring ExactTarget.

80.    A reasonable investor would have viewed the information regarding the impending CRM-ExactTarget Transaction as being important to his investment decision or as significantly altering the total mix of information available to the public.  In addition, the information was considered confidential by JPMS and ExactTarget.

### *Two Analyst-Friends of Aggarwal at JPMS Are Assigned to Work on the ExactTarget Transaction*

81.    JPMS's deal team for ExactTarget included Aggarwal's friends, Analyst Two and Analyst Three, who were among the first individuals at JPMS to learn, on April 25, 2013, of ExactTarget's possible acquisition by CRM.  Analysts Two and Three had graduated from Berkeley in 2011, the year after Aggarwal's graduation, and they both worked with Aggarwal in the TMT Group at JPMS.  Aggarwal spent significant amounts of time with Analyst Two and Analyst Three during their respective tenures at JPMS.  Between April and June 2013, Aggarwal sat on the same side of the same floor at JPMS as Analyst Two, and Aggarwal sat

directly adjacent to Analyst Three in the same cubicle cluster, separated by a half-sized wall divider.  Aggarwal also shared meals and attended social gatherings, such as movie screenings and cocktail hours, with Analyst Two.

***May 3-7, 2013***

82.     On May 3, 2013, two days after ExactTarget formally engaged JPMS as its financial adviser, records show that Aggarwal exchanged numerous text messages with Bolandian.  On each day from Friday, May 3, 2013, through Monday, May 6, 2013, Bolandian and Sadigh exchanged numerous text messages, and on May 4, 2013, they spoke by telephone.

83.     On Tuesday, May 7, 2013, JPMS was informed that ExactTarget's Board of Directors had met and discussed the company's first quarter 2013 results, and that ExactTarget planned to continue discussions with potential business partners, including CRM.

84.     That same day, on May 7, 2013, at 6:32 p.m., records show that Bolandian sent two text messages to Aggarwal, who responded by text at 11:29 p.m. Records also show that Bolandian and Sadigh exchanged numerous texts during the day and into the evening on May 7.

85.     From May 7, 2013, to June 3, 2013, the last trading day before the public announcement of the CRM-ExactTarget Transaction, the closing price of ExactTarget stock ranged from $20.91 to $23.49 per share.

***May 8, 2013***

86.     On May 8, 2013, Bolandian took steps in anticipation of his first purchases of ExactTarget securities.  Specifically, records show that Bolandian increased available cash in his TDA brokerage account by selling another security held in that account and having additional funds wired into the account.

87.     That same day, Wednesday, May 8, 2013, Sadigh made his first purchases of ExactTarget securities, buying 3,000 shares in his Interactive Brokers account.  Later that day, Sadigh sold 700 of these shares.

*May 9, 2013*

88.     On Thursday, May 9, 2013, JPMS met with the Special Committee to consider a proposal from CRM for the acquisition of ExactTarget.  That same day, Sadigh and Bolandian purchased or arranged for the purchase of a total of 422 call options in ExactTarget, in apparent coordination with one another:

a.   First, between 6:37 a.m. and 6:42 a.m., Sadigh bought a total of 60 call options in ExactTarget that had a strike price of $22.50 and were set to expire in September 2013 ("September $22.50 ExactTarget call options").   A few hours later, at 11:12 a.m., Sadigh bought 50 ExactTarget call options that had a strike price of $22.50 and were set to expire in May 2013 ("May $22.50 ExactTarget call options").

b.   That same morning, Bolandian made his first purchases of ExactTarget securities.  Between 8:07 a.m. and 11:34 a.m., Bolandian purchased a total of 77 September $22.50 ExactTarget call options and 130 May $22.50 ExactTarget call options in his personal brokerage accounts.

c.   At 12:08 p.m., records show that Bolandian and Sadigh spoke for 10 minutes on the telephone.  Shortly thereafter, at 12:43 p.m., Sadigh bought an additional 21 September $22.50 ExactTarget call options.

89.     Bolandian also arranged for additional ExactTarget call options purchases in his family members' brokerage accounts.  Account records show that, during the morning of May 9, 2013, within minutes of the purchases in Bolandian's own account, four September $22.50 ExactTarget call options were purchased in the TDA brokerage account of Bolandian's sister, Pardis.  Nearly all of the funds then available in Pardis's account were used for this purchase.  Later that same morning, between 10:32 a.m. and 10:54 a.m., 30 September $22.50 ExactTarget call options and 50 May $22.50 ExactTarget call options were purchased in the TDA brokerage account of Bolandian's father, Farhad.  Nearly all of the funds then available in Farhad's account were used for this purchase.  Prior to these purchases, neither

Farhad's nor Pardis's brokerage accounts had been used to make trades since February 2013 and December 2012, respectively.

90.    The purchases in Farhad's and Pardis's brokerage accounts on May 9, 2013, were made through orders placed online from the same Internet Protocol ("IP") address that was used to make the purchases in Bolandian's personal brokerage accounts that same morning (hereinafter the "Bolandian IP Address"). Records from the internet service provider show that the Bolandian IP Address was associated with a residence where Bolandian lived at the time.

91.    In total, the brokerage accounts of Sadigh, Bolandian, Farhad, and Pardis purchased 192 September $22.50 ExactTarget call options on May 9, 2013. This combined sum represented 100% of the total trading in the September $22.50 series of ExactTarget call options that day, across all exchanges.  Sadigh's, Bolandian's, and Farhad's accounts also collectively purchased another 230 May $22.50 ExactTarget call options that same day.

**May 11-16, 2013**

92.    On May 11, 2013, JPMS learned that ExactTarget's CEO had suggested to CRM that the companies continue to discuss CRM's proposed acquisition price. Two days later, on May 13, 2013, JPMS met with the Special Committee and had additional discussions with potential business combination partners.

93.    On the afternoon of Monday, May 13, 2013, records show that Aggarwal called Bolandian, and the two men spoke for at least 24 minutes.

94.    On May 15, 2013, between 7:52 a.m. and 1:56 p.m., Bolandian and Sadigh sold all of their May $22.50 ExactTarget call options, and all of the May $22.50 ExactTarget call options were sold from Farhad's account.  These options had been purchased six days earlier, and they were due to expire two days later.  At 1:12 p.m., less than an hour before completing the sales of his May $22.50 ExactTarget call options, records indicate that Bolandian called Sadigh and the two spoke for three minutes.

95.   Late in the evening of May 15, 2013, at 9:54 p.m., Analyst Two exchanged instant messages with Aggarwal on JPMS's internal instant messaging platform.  In this exchange, Analyst Two informed Aggarwal that the senior management of a JPMS investment banking client was working late at the JPMS office and had a meeting with a potential acquirer the next day:

> Aggarwal (9:54 p.m.) – "are you still here?"
>
> Analyst Two – "yea[,] management team is still here[.]  they want to stay till like 2 am."
>
> Aggarwal – "WT F"
>
> Analyst Two – "ceo, cfo[,] everyone"
>
> Aggarwal – "NO WAY that is CRAZY ive never heard of that...  i dont understand the rush."
>
> Analyst Two – "yea[,] they are hardcore …  well we have a meeting tomorrow"
>
> Aggarwal – "board?"
>
> Analyst Two – "potential buyer"
>
> Aggarwal – "ohh[,] that makes sense"

96.   Around the time of the communications between Analyst Two and Aggarwal on May 15, 2013, Aggarwal, as a member of the TMT Group and friend of Analyst Two, was aware that Analyst Two had been assigned to work on the impending (yet still confidential) ExactTarget acquisition.  The foregoing instant message exchange thus provided Aggarwal with timely, material nonpublic information relating to the advanced status of ExactTarget's discussions with a potential business partner.  Specifically, the exchange informed Aggarwal that these or other discussions could lead to a near-term public announcement that ExactTarget was being acquired.

97.     The next day, on May 16, 2013, as indicated in Analyst Two's message the day before, ExactTarget's senior management held a meeting with the senior management of a potential buyer.  That potential buyer was CRM.

***May 17-23, 2013***

98.     From May 17, 2013 to May 22, 2013, JPMS continued to participate in meetings about a potential business combination involving ExactTarget.

99.     On Tuesday, May 21, 2013, records show that Bolandian communicated with both Aggarwal and Sadigh in close succession.  For example, records show that after exchanging text messages with Aggarwal three times from 9:27 a.m. to 9:28 a.m., Bolandian texted Sadigh two times at 9:30 a.m.  Then, at 10:23 a.m., Bolandian initiated a nine-minute telephone call with Sadigh, during which time Bolandian exchanged at least five text messages with Aggarwal.

100.     On Thursday, May 23, 2013, Bolandian opened an account at Swiss America Securities, Ltd. ("Swiss America"), a broker-dealer located in Nassau, Bahamas and registered with the Securities Commission of The Bahamas.  That same day, records show that Bolandian and Aggarwal exchanged multiple text messages, as did Bolandian and Sadigh.

***May 24-25, 2013***

101.     On the morning of Friday, May 24, 2013, Bolandian bought four ExactTarget call options that had a strike price of $22.50 and were set to expire in July 2013 ("July $22.50 ExactTarget call options") in his TDA account, using funds he received from the sale of two call options of another issuer on May 21, 2013. Later that same morning, Bolandian bought 35 more July $22.50 ExactTarget call options in his Interactive Brokers account.

102.     Records show that Bolandian exchanged text messages with Aggarwal minutes before and minutes after the purchases in his Interactive Brokers account.

103.    Bolandian's total purchases of 39 July $22.50 ExactTarget call options on May 24, 2013, constituted 100% of the total trading in that call option series that day, across all exchanges.

104.    Also on May 24, 2013, Analyst Three sent Aggarwal an email that included an update on JPMS's work on behalf of ExactTarget.  The message stated, in part, "Excalibur is going to be really busy the next three weeks.  We've gotten a lot of momentum with bids, and we could go to Fairness Committee in two weeks." As a member of the TMT group, Aggarwal knew that "Excalibur" was a reference to JPMS's confidential engagement with ExactTarget.  Further, Aggarwal understood "go[ing] to Fairness Committee" to refer to a process, in the final stages before the announcement of a corporate acquisition, in which JPMS would provide a designated committee of the target company's directors with an opinion regarding whether the proposed transaction price is fair.  Thus, the email from Analyst Three informed Aggarwal that negotiations concerning the still-confidential transaction involving ExactTarget were at an advanced stage.

105.    On Saturday, May 25, 2013, CRM delivered a revised indication of interest that increased its proposed purchase price for ExactTarget.  JPMS attended ExactTarget's Board of Directors' meeting where the board approved ExactTarget's entering into exclusive negotiations with CRM.

### May 26, 2013

106.    On Sunday, May 26, 2013, Bolandian authorized Swiss America to charge his personal credit card in the amount of $15,000, in order to fund Bolandian's newly-opened off-shore brokerage account.

### May 28, 2013

107.    On Tuesday, May 28, 2013, at 12:16 p.m., records show that Sadigh called Bolandian and the two men spoke for at least 27 minutes.  During the call, the Bolandian IP Address was used to log into Sadigh's Interactive Brokers and OptionsHouse accounts, indicating that Sadigh's brokerage accounts were accessed

from a computer in Bolandian's residence while Bolandian and Sadigh were speaking with each other on the phone.  Minutes after the call, records show that Sadigh's OptionHouse account was accessed from a different IP address – an IP address that, records show, regularly accessed Sadigh's OptionsHouse account in May 2013.

108.   Bolandian and Sadigh then purchased the same series of ExactTarget call options, at the same time, through their online brokerage accounts.  At 12:53 p.m., Bolandian bought 15 July $22.50 ExactTarget call options.  Also at 12:53 p.m., using the proceeds from his sale of May $22.50 ExactTarget call options on May 15, 2013, Sadigh bought 10 July $22.50 ExactTarget call options.

109.   The purchase of 25 July $22.50 ExactTarget call options collectively by Bolandian and Sadigh on May 28, 2013, constituted 100% of the total trading in that call option series that day, across all exchanges.

***May 29, 2013***

110.   On Wednesday, May 29, 2013, both Bolandian and Sadigh further modified their positions in ExactTarget in a manner consistent with the belief that ExactTarget's stock price would experience a near-term surge.  Bolandian sold September ExactTarget call options and purchased less expensive ExactTarget call options that had shorter expiration dates, thereby positioning himself to maximize his profits in the event ExactTarget's stock price experienced a near-term increase that exceeded the options' strike price.  Similarly, Sadigh sold his remaining ExactTarget stock, which he could have held indefinitely and profited from if the stock price later increased, and purchased ExactTarget call options with June and July expiration dates – a trading strategy that would allow Sadigh to profit only if ExactTarget's stock price exceeded the option strike price before the June and/or July expiration dates.

111.   Phone and brokerage records indicate that Bolandian and Sadigh coordinated these transactions, as follows:

    a.  Between 10:15 a.m. and 10:22 a.m., Bolandian sold his seven September $22.50 ExactTarget call options in his TDA account and, using the proceeds from that sale, bought nine July $22.50 ExactTarget call options, which had lower premiums than the options he just sold.

    b.  At 10:36 a.m., Bolandian called Sadigh and the two men spoke for at least 14 minutes.

    c.  At 10:55 a.m., Sadigh bought 10 Exact Target call options that had a strike price of $22.50 and were set to expire in June 2013, only three weeks later ("June $22.50 ExactTarget call options").

    d.  Between 11:41 a.m. and 12:17 p.m., Sadigh sold his remaining 2,300 shares of ExactTarget and, using proceeds from that sale, bought 50 July $22.50 ExactTarget call options.

    e.  Between 12:45 p.m. and 12:53 p.m., 24 June $22.50 ExactTarget call options were purchased in Farhad's TDA account.  These purchases were funded with the proceeds from the sale of the May $22.50 ExactTarget call options in Farhad's account on May 15, 2013.

    f.  At 12:53 p.m., Sadigh called Bolandian, and the two men spoke for at least seven minutes.

112.  The foregoing purchases of 59 July $22.50 ExactTarget call options and 34 June $22.50 ExactTarget call options constituted 100% of the total trading in those call option series that day, across all exchanges.

***May 30, 2013***

113.  On Thursday, May 30, 2013, at 10:34 a.m., Bolandian bought one June $22.50 ExactTarget call option in his TDA account, using the remaining proceeds from the sale of the September $22.50 ExactTarget call options on the previous day. Less than half an hour later, at 10:59 a.m., records show that Bolandian called and spoke to Aggarwal for over 20 minutes.

114.   At 12:01 p.m. on May 30, 2013, Sadigh bought 20 July $22.50 ExactTarget call options.  Sadigh's purchase constituted 100% of the total trading in that call option series that day, across all exchanges.

115.   Also on May 30, 2013, Analyst Two forwarded Aggarwal an internal JPMS email that concerned "fairness discussion materials" for the "Excalibur" matter.  The email also included a page from the fairness materials addressing how the purchaser would finance the transaction.  This email informed and reinforced for Aggarwal that a public announcement of ExactTarget's acquisition could be imminent.

***May 31, 2013***

116.   On Friday, May 31, 2013, Bolandian bought 100 additional June $22.50 ExactTarget call options in his newly-opened, off-shore Swiss America account.  Bolandian made this purchase using the entire $15,000 that had been charged to his credit card to fund this account.  The purchase represented 100% of the total trading in that call option series that day, across all exchanges.

***June 1-3, 2013***

117.   On Saturday, June 1, 2013, at 3:00 p.m., records show that Aggarwal called Bolandian, and the two spoke for over 23 minutes.  Minutes later, at 3:31 p.m., Bolandian called and spoke to Sadigh for over 15 minutes.

118.   On Sunday afternoon, June 2, 2013, records show that Bolandian telephoned and spoke to Aggarwal for over 14 minutes.

119.   On the morning of Monday, June 3, 2013, between 11:27 a.m. and 11:56 a.m., Bolandian's Interactive Brokers account, Paris's TDA account, and Farhad's TDA account all were accessed from the Bolandian IP Address.  During this time, Bolandian sold all the September $22.50 ExactTarget call options held in his Interactive Brokers account.  In addition, sale orders were entered for all of the September $22.50 ExactTarget call options held in Pardis's and Farhad's TDA accounts.

120.    The proceeds from the foregoing sales were then used to purchase greater quantities of ExactTarget call options with shorter expiration dates and lower premiums, in the following amounts and in the following manner:

      a.  155 June $22.50 ExactTarget call options, in Bolandian's Interactive Brokers account;

      b.  65 June $22.50 ExactTarget call options, in Farhad's TDA account; and

      c.  Nine June $22.50 ExactTarget call options, in Pardis's TDA account.

121.    By exchanging his September call options for a greater number of less expensive June call options, Bolandian once again positioned himself to maximize his profits in the event ExactTarget's stock price experienced a near-term increase – specifically, in the event the stock price exceeded the options' strike price before the third Friday in June.

122.    Also on June 3, 2013 – approximately 15 minutes after the last of the ExactTarget call option trades that day in the accounts of Bolandian, Farhad, and Pardis – records show that Bolandian called Sadigh.  The two spoke for over two minutes.

123.    Minutes later, on June 3, 2013, at 12:20 p.m., Sadigh purchased 20 July $22.50 ExactTarget call options.

124.    Collectively, the foregoing purchases on June 3, 2013, constituted 100% of the total trading in the June $22.50 ExactTarget and July $22.50 ExactTarget call option series that day, across all exchanges.

125.    When U.S. markets closed on June 3, 2013, ExactTarget's share price was $22.10.

***June 4, 2013***

126.    Before U.S. markets opened on June 4, 2013, CRM and ExactTarget announced to the public that they had signed a definitive agreement under which CRM would acquire ExactTarget.  The agreement provided that CRM would commence a tender offer for all outstanding shares of ExactTarget for $33.75 per

share.  Before June 4, 2013, the proposed merger between CRM and ExactTarget was material, nonpublic information.

127.   Immediately after the public announcement, ExactTarget's stock price and trading volume increased substantially.  The price of ExactTarget's stock closed at $33.69 per share on June 4, 2012, an increase of 50% from the June 3, 2013 closing price.  The trading volume increased 7,521%, from 447,432 shares on June 3, 2013, to 34,099,951 shares on June 4, 2013.

128.   That same morning, after the announcement of the merger, Bolandian sold all of the ExactTarget call options held in his TDA, Interactive Brokers, and Swiss America accounts.  Within the same thirty-minute period, all of the ExactTarget call options in Farhad and Pardis's TDA accounts were sold; and Sadigh sold all of his ExactTarget options in his Interactive Brokers and OptionsHouse accounts.

129.   Records show that Bolandian and Sadigh spoke on the phone for over 17 minutes as they sold their ExactTarget call options, as described.  Later in the morning on June 4, 2013, records show that Bolandian and Aggarwal exchanged numerous text messages, as did Bolandian and Sadigh.  Bolandian and Sadigh also had two more telephone calls that day.

130.   The foregoing trading in ExactTarget securities resulted in profits of over $317,000 in Bolandian's accounts, approximately $91,000 in Farhad's account, approximately $9,300 in Pardis's account, and approximately $178,000 in Sadigh's accounts.  Combined, Sadigh and Bolandian (through his accounts and the accounts of Farhad and Pardis) made approximately $595,000 in illicit profits by trading in ExactTarget securities on the basis of material, nonpublic information.

131.   In the afternoon of June 4, 2013, Aggarwal forwarded to Analyst Two an internal JPMS email highlighting JPMS's role in the CRM-ExactTarget Transaction.  Although the internal JPMS email did not mention that Analyst Two was involved in the transaction, Aggarwal's forwarding message reflects his

personal awareness of Analyst Two's involvement.  Referring to their upcoming departures from JPMS, Aggarwal congratulated Analyst Two for his work on the transaction:  "Congrats [Analyst Two]!  Killing it before we bounce."

### Aggarwal Profits By Recommending ExactTarget Options To Another Friend Before the CRM-ExactTarget Transaction Announcement

132.   In March 2013, while Aggarwal was employed by JPMS, Aggarwal and Friend One discussed an arrangement under which Aggarwal would help Friend One learn how to trade stock options.  Aggarwal and Friend One also discussed sharing in the profits and losses from Friend One's trading, but they did not, at this time, reach a specific agreement as to how the profits and losses would be divided.

133.   On March 11, 2013, Aggarwal and Friend One exchanged emails about Friend One obtaining approval from his broker to trade options.  In one of the emails, Aggarwal stated, "with options approval under your belt, we both can always be ready to fire going fwd."

134.   Before Sunday, May 12, 2013, by virtue of Aggarwal's membership in the TMT group and his friendship with and proximity to Analysts Two and Three, Aggarwal possessed material, nonpublic information concerning ExactTarget's potential acquisition by CRM or one of several other potential business combination partners.

135.   On May 12, 2013, days after Bolandian and Sadigh made their first purchases of ExactTarget call options, Friend One met Aggarwal in Aggarwal's apartment in San Francisco.  During this meeting, Aggarwal and Friend One used a computer to log into a brokerage account controlled by Friend One, and Aggarwal recommended that Friend One purchase ExactTarget call options.  Aggarwal specifically advised Friend One to purchase ExactTarget call options that had a strike price of $22.50 and would expire in September 2013.  Friend One had not heard of ExactTarget before Aggarwal's May 12, 2013 recommendation.

136.   Relying on Aggarwal's recommendation, Friend One purchased seven September $22.50 Exact Target call options.  The trade was recorded in Friend One's brokerage account on the next trading day, Monday, May 13, 2013.

137.   From April 2013 to at least August 2013, Friend One bought other securities based on Aggarwal's advice, including call options of a company for which Aggarwal performed services as a JPMS analyst.

138.   After the June 4, 2013, public announcement that CRM would buy ExactTarget, Aggarwal and Friend One agreed that Friend One should sell the previously purchased ExactTarget call options.  On July 10, 2013, Friend One sold his seven call options, obtaining profits of approximately $6,600.

139.   In July 2013, Friend One and Aggarwal discussed dividing the profits that Friend One had obtained from the securities trades that he had made based on Aggarwal's recommendations.

140.   In December 2013, Aggarwal and Friend One had a telephone conversation in which they agreed to share in the profits that Friend One had obtained from trading based on Aggarwal's recommendations.  Friend One determined that, from March to December 2013, Friend One netted approximately $7,300 to $7,900 from Aggarwal's recommendations, including the $6,600 in ExactTarget profits.  Later in December 2013, Friend One met Aggarwal in San Francisco and handed him a cashier's check for $6,000, which represented a share of the trading profits.  Aggarwal accepted the check.

**G.**   **Aggarwal, Bolandian, and Sadigh Breached Their Duties To Maintain Material, Nonpublic Information In Confidence**

141.   The information regarding the impending IDTI-PLXT Transaction in 2012 and the impending CRM-ExactTarget Transaction in 2013 that Aggarwal tipped Bolandian, and that Bolandian in turn tipped Sadigh, was material and nonpublic.  Aggarwal learned the information regarding the two impending Transactions in his capacity as a JPMS analyst, before the public announcements of

32

those Transactions.  As a JPMS employee, Aggarwal assumed and owed a duty to JPMS to maintain the confidentiality of information related to the two impending Transactions.  Aggarwal knew, or was reckless in not knowing, that information he learned about the two impending Transactions before their public announcements was material and nonpublic.  Aggarwal knew, or was reckless in not knowing, that he owed a duty, arising from a relationship of trust and confidence, to keep the information about the two impending Transactions confidential.  Aggarwal also knew, or was reckless in not knowing, that he was subject to JPMS's written policies and procedures regarding confidentiality and insider trading.

142.   Aggarwal breached his duty of trust and confidence owed to JPMS by divulging material, nonpublic information about the two impending Transactions to Bolandian.  Aggarwal knew, or was reckless in not knowing, that Bolandian would either trade on the material, nonpublic information that Aggarwal divulged, and/or that Bolandian would provide the information to others who would trade based on the information.

143.   Bolandian knew, or was reckless in not knowing, that the information he received about the two impending Transactions and before their respective public announcements was material and nonpublic.  Bolandian traded on this information even though he knew, consciously avoided knowing, was reckless in not knowing, or should have known that Aggarwal breached his duty of trust and confidence for a personal benefit by providing information about the impending Transactions.  Additionally, Bolandian knew, or was reckless in not knowing, that Sadigh would trade on the material, nonpublic information that Bolandian divulged to Sadigh.

144.   Sadigh knew, or was reckless in not knowing, that the information he received about the two impending Transactions and before their respective public announcements was material and nonpublic.  Sadigh traded on this information even though he knew, consciously avoided knowing, was reckless in not knowing, or

should have known that the information given to him had been improperly obtained in breach of a duty of trust and confidence.

145.   Aggarwal tipped the material, nonpublic information regarding the two impending Transactions to Bolandian with the intent to benefit Bolandian in exchange for personal benefits, direct or indirect, that were previously provided, were provided on an ongoing basis, or were to be provided in the future to Aggarwal. These personal benefits included, but were not limited to (a) the satisfaction of making gifts of confidential information to his close friend, Bolandian; (b) Bolandian's agreement to hold and to trade securities in Bolandian's own account for the joint benefit of Bolandian and Aggarwal, an arrangement that enabled Aggarwal to circumvent JMPS's personal trading pre-clearance and reporting rules; and (c) on information and belief, Aggarwal's ability to share in the profits and recoup losses from securities trades in Bolandian's account(s).

146.   In addition, on information and belief, Aggarwal received other personal benefits from Bolandian that included certain paid hotel and dining expenses as follows:

- Records show that on June 5, 2013, the day after the public announcement of the CRM-ExactTarget Transaction and Bolandian's sale of his ExactTarget securities, Bolandian made telephone calls to two Las Vegas, Nevada hotels and then exchanged text messages with Aggarwal.  A little over two weeks later, between June 21 and June 24, 2013, Aggarwal and Bolandian took a recreational trip to Las Vegas. Casino hotel records show that Bolandian paid for two or more hotel rooms for multiple guests with his credit card during that trip, but do not indicate that Aggarwal paid for any rooms; and

- Records show that on June 12, 2013, Bolandian withdrew $26,000 in cash from his bank account.  Two days later, on or about June 14, 2013, Bolandian traveled from Los Angeles to San Francisco,

California, where he and Aggarwal dined together at an upscale restaurant, spending over $640 on dinner and wine for two.  The bill was paid for in cash.

147.   Bolandian knew, consciously avoided knowing, was reckless in not knowing, or should have known that, by providing material, nonpublic information about the two Transactions, Aggarwal breached his duty of trust and confidence, and received personal benefits.

148.   Sadigh knew, consciously avoided knowing, was reckless in not knowing, or should have known that he received material, nonpublic information about the two Transactions in breach of a duty of trust and confidence by, and in exchange for a personal benefit to, one or more persons with knowledge of the two Transactions.  Sadigh was aware of Bolandian's close personal friendship with Aggarwal, whom Sadigh knew to work at JP Morgan Chase.  Sadigh also joined Aggarwal and Bolandian during their June 21-24 trip to Las Vegas where, on information and belief, both Sadigh and Aggarwal stayed in lodging paid by Bolandian.

149.   Aggarwal also breached his duty of trust and confidence owed to JPMS by recommending that Friend One buy ExactTarget securities in advance of the public announcement of the ExactTarget acquisition, and then sharing in the profits that resulted from such trading.  Aggarwal knew, or was reckless in not knowing, that Friend One would buy ExactTarget call options based on Aggarwal's advice.

### FIRST CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
### (Against Defendants Aggarwal, Bolandian, and Sadigh)
### Insider Trading in PLXT

150.   The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 137, inclusive, as if they were fully set forth herein.

151.   By engaging in the conduct described above, Aggarwal, Bolandian, and Sadigh, directly or indirectly, in connection with the purchase or sale of PLXT securities, by use of the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange:

      a.    employed devices, schemes or artifices to defraud;

      b.    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

      c.    engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

152.   By engaging in the foregoing conduct, Aggarwal, Bolandian, and Sadigh violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
### (Against Defendants Aggarwal, Bolandian, and Sadigh)
### Insider Trading in ExactTarget

153.   The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 140, inclusive, as if they were fully set forth herein.

154.   By engaging in the conduct described above, Aggarwal, Bolandian, and Sadigh, directly or indirectly, in connection with the purchase or sale of ExactTarget securities, by use of the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange:

      a.    employed devices, schemes or artifices to defraud;

b.    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

c.    engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

155.   By engaging in the foregoing conduct, Aggarwal, Bolandian, and Sadigh violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF

### Violations of Section 14(e) of the Exchange Act and Rule 14e-3 Thereunder
### (Against Defendants Aggarwal, Bolandian, and Sadigh)
### Insider Trading in Connection with Tender Offer (PLXT)

156.   The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 143, inclusive, as if they were fully set forth herein.

157.   By April 2012, the time period during which the first trades in PLXT securities alleged herein occurred, or by such other times when trades in PLXT securities alleged herein occurred, substantial steps had been taken to commence a tender offer for the securities of PLXT by IDTI, including, among other things: (a) JPMS was formally engaged as a financial adviser to the offeror, IDTI; (b) the offeror's board had authorized an expression of interest to acquire the issuer, PLXT, at a price that was substantially higher than PLXT's then-recent market price; (c) the offeror and its advisers, including JPMS, engaged in substantive negotiations with the issuer and its advisers concerning the structure and timeline of the acquisition;

and (d) JPMS had attended due diligence meetings with PLXT and IDTI and was provided access to due diligence information from PLXT.

158.   Aggarwal knew or had reason to know that information about IDTI's anticipated tender offer for the securities of PLXT was nonpublic information that had been acquired, directly or indirectly, from either IDTI, the offeror, PLXT, the issuer that was the target of the tender offer, or from any person acting on behalf of the offeror or the issuer-target.  Aggarwal communicated material, nonpublic information regarding IDTI's tender offer for the securities of PLXT to Bolandian, and Bolandian communicated material, nonpublic information regarding IDTI's tender offer for the securities of PLXT to Sadigh.  These communications occurred under circumstances in which it was reasonably foreseeable that unlawful trading would result.

159.   Bolandian and Sadigh knew or had reason to know that the confidential information that each of them received about the impending IDTI-PLXT Transaction was nonpublic and had been acquired, directly or indirectly, from either IDTI, the offeror, or PLXT, the issuer that was the target of the tender offer, or from any person acting on behalf of the offeror or the issuer-target, and therefore they were prohibited from trading in the securities of PLXT.

160.   By reason of the foregoing, Aggarwal, Bolandian, and Sadigh violated and, unless enjoined, will continue to violate Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3].

## FOURTH CLAIM FOR RELIEF
### Violations of Section 14(e) of the Exchange Act and Rule 14e-3 Thereunder
### (Against Defendants Aggarwal, Bolandian, and Sadigh)
### Insider Trading in Connection with Tender Offer (ExactTarget)

161.   The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 148, inclusive, as if they were fully set forth herein.

162.   By May 8, 2013, the time period during which the first trades in ExactTarget securities alleged herein occurred, or by such other times when trades in ExactTarget securities alleged herein occurred, substantial steps had been taken to commence a tender offer for the securities of ExactTarget by CRM, including, among other things:  (a) JPMS was formally engaged as a financial adviser to the issuer, ExactTarget; (b) the issuer had already received an indication of interest from the offeror, CRM, of which JPMS was aware; and (c) JPMS engaged in substantive discussions with other potential business partners regarding a potential acquisition of the issuer.

163.   Aggarwal knew or had reason to know that information about CRM's anticipated tender offer for the securities of ExactTarget was nonpublic information that had been acquired, directly or indirectly, from either CRM, the offeror, ExactTarget, the issuer that was the target of the tender offer, or from any person acting on behalf of the offeror or the issuer-target.  Aggarwal communicated material, nonpublic information regarding CRM's tender offer for the securities of ExactTarget to Bolandian, and Bolandian communicated material, nonpublic information regarding CRM's tender offer for the securities of ExactTarget to Sadigh.  These communications occurred under circumstances in which it was reasonably foreseeable that unlawful trading would result.  Additionally, Aggarwal caused Friend One to purchase ExactTarget securities.

164.   Bolandian and Sadigh knew or had reason to know that the confidential information that each of them received about the impending CRM-ExactTarget Transaction was nonpublic and had been acquired, directly or indirectly, from either CRM, the offeror, or ExactTarget, the issuer that was the target of the tender offer, or from any person acting on behalf of the offeror or the issuer-target, and therefore they were prohibited from trading in the securities of ExactTarget.

165.   By reason of the foregoing, Aggarwal, Bolandian, and Sadigh violated and, unless enjoined, will continue to violate Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3].

### FIFTH CLAIM FOR RELIEF

### Unjust Enrichment

### (Against Relief Defendants Farhad Bolandian and Pardis Bolandian)

166.   The Commission re-alleges and incorporates by reference the allegations in paragraphs 1 through 153 inclusive, as if they were fully set forth herein.

167.   Based on material, nonpublic information provided by Aggarwal, Bolandian engaged in insider trading in the securities of PLXT and ExactTarget in the accounts of Relief Defendants Farhad Bolandian and Pardis Bolandian.  Relief Defendants Farhad Bolandian and Pardis Bolandian have no legitimate claim to the proceeds of the transactions in PLXT and ExactTarget securities described in this Complaint, and have been unjustly enriched.  It is not just, equitable, or conscionable for Farhad Bolandian or Pardis Bolandian to retain profits from insider trading.

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter Final Judgments:

### I.

Permanently restraining and enjoining Defendants Aggarwal, Bolandian, and Sadigh from, directly or indirectly, engaging in conduct in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and from engaging in conduct in violation of Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3];

### II.

1   Ordering Defendants Aggarwal and Bolandian to jointly and severally

2   disgorge, with prejudgment interest, all illicit trading profits or other ill-gotten gains

3   received by any person or entity, including but not limited to all direct and indirect

4   tippees, as a result of the actions alleged herein;

5                                      **III.**

6   Ordering Defendants Aggarwal, Bolandian, and Sadigh to jointly and

7   severally disgorge, with prejudgment interest, all illicit trading profits or other ill-

8   gotten gains received by Sadigh and any person tipped by Sadigh directly or

9   indirectly;

10                                     **IV.**

11   Ordering Relief Defendants Farhad Bolandian and Pardis Bolandian each,

12   jointly and severally with Defendants, to disgorge amounts equal to the funds they

13   obtained, directly or indirectly, from the insider trading by Defendants, including

14   prejudgment interest thereon;

15                                     **V.**

16   Ordering Defendants Aggarwal, Bolandian, and Sadigh to pay civil penalties

17   pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1]; and

18                                     **VI.**

19   Granting such other and further relief as this Court may deem just, equitable,

20   or necessary.

21                                      Respectfully submitted,

22

23   Dated:  August 22, 2016              _/s/ Robert I. Dodge_

24                                        David S. Mendel
                                              (admitted pro hac vice)
25                                        Robert I. Dodge
                                              (admitted pro hac vice)
26                                        Matthew C. Solomon
                                              (admitted pro hac vice)
27                                        Paul E. Kim
                                              (admitted pro hac vice)
28

41

Attorneys for Plaintiff
**U.S. SECURITIES AND EXCHANGE**
**COMMISSION**
100 F Street, N.E.
Washington, D.C.  20549-5971
Telephone:  (202) 551-4418 (Mendel)
Telephone:  (202) 551-4421 (Dodge)
Telephone:  (202) 551-5949 (Solomon)
Telephone:  (202) 551-4504 (Kim)
Facsimile:  (202) 551-9282

John B. Bulgozdy, Local Counsel
**U.S. SECURITIES AND EXCHANGE**
**COMMISSION**
444 South Flower Street, Suite 900
Los Angeles, CA 90071
Telephone:  (323) 965-3998
Facsimile:  (323) 965-3908
SECURITIES AND EXCHANGE
COMMISSION

DAVID S. MENDEL
Email:  MendelD@sec.gov
MATTHEW P. COHEN
Email:  CohenMa@sec.gov
PAUL E. KIM
Email:  KimPa@sec.gov

SECURITIES AND EXCHANGE
COMMISSION
100 F Street, N.E.
Washington, D.C.  20549-5971
Telephone:  (202) 551-4418
Facsimile:  (202) 551-9282

LOCAL COUNSEL:
John B. Bulgozdy, Cal. Bar No. 219897
Email:  BulgozdyJ@sec.gov

SECURITIES AND EXCHANGE
COMMISSION
444 South Flower Street, Suite 900
Los Angeles, CA 90071
Telephone:  (323) 965-3998
Facsimile:  (323) 965-3908

Attorneys for Plaintiff
Securities and Exchange Commission

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>ASHISH AGGARWAL, SHAHRIYAR BOLANDIAN, and KEVAN SADIGH,<br><br>Defendants,<br><br>and<br><br>FARHAD BOLANDIAN and PARDIS BOLANDIAN,<br><br>Relief Defendants. | Case No. CV 15-6460-TJH<br><br>**PROOF OF SERVICE** |

1

**PROOF OF SERVICE**

On August 22, 2016, I caused the foregoing **FIRST AMENDED COMPLAINT**

1.   to be filed on the Court's CM/ECF system, which causes a Notice of Electronic Filing to be automatically sent by email to all CM/ECF users who have appeared in this case and consented to receive service through the CM/ECF system;

2.   to be served on Defendant SHAHRIYAR BOLANDIAN by electronic mail to Michael J. Proctor, Esq., proctor@caldwell-leslie.com; and

3.   to be served on Relief Defendants Farhad Bolandian and Pardis Bolandian by U.S. Mail to the relief defendants' last known addresses, as follows:

Farhad Bolandian                        Pardis Bolandian
[Redacted]                              [Redacted]
Los Angeles, CA 90048                   Los Angeles, CA 90034


Dated:   August 22, 2016          _/s/   Robert I. Dodge _____
                                         Robert I. Dodge